The FIRST NATIONAL BANK OF CAPE GIRARDEAU, Missouri, Trustee for the Heirs of Charles A. Juden and Cleo M. Juden, Appellant,

v.

SOCONY MOBIL OIL COMPANY, INCORPORATED, Respondent.

No. 56351.

Supreme Court of Missouri, Division No. 1.

May 14, 1973.

Rehearing Denied June 11, 1973.

Joe T. Buerkle, Buerkle, Buerkle & Lowes, Jackson, for appellant.

Stephen N. Limbaugh, Limbaugh, Limbaugh & Russell, Cape Girardeau, for respondent.

HIGGINS, Commissioner.

Action by plaintiff in Count I for ejectment of defendant from land in Cape Girardeau, Missouri, on which defendant maintains an unloading dock facility on the Mississippi River and for damages for loss of rents and profits accruing at a rate of $15,000 per year since May, 1954; in Count II for trespass, injunction, and $23,000 damages; and in Count III for mandatory injunction for removal of facilities and $200,000 punitive damages. Defendant, in answer to Count I, denied plaintiff's right to recovery in ejectment, claimed a right to possession as lessee in three interdependent leases having 50-year terms, and asserted defenses of laches, limitations, condonation of defendant's lease, abandonment by virtue of the lease, estoppel, unclean hands, failure of plaintiff's title, and unjust enrichment; in answer to Count II, reasserted the defenses stated to Count I and alleged further the defense of limitations under Section 516.020, RSMo 1969, V.A.M.S.; and in answer to Count III, reasserted all the defenses stated to Counts I and II. Pursuant to stipulation, the issue of damages was severed for separate trial; the parties went to trial to the court on the remaining issues, and the court found the issues in favor of the defendant and entered judgment for defendant on plaintiff's claims for ejectment, trespass, and injunctive relief. Plaintiff appeals from its failure to recover and the total amount stated in its petition exceeds the amount which establishes jurisdiction in the Supreme Court. Pan American Realty Corp. v. Forest Park Manor, Inc., 431 S.W.2d 144, 146 (Mo.1968); Sharp v. Interstate Motor Freight System, 442 S. W.2d 939, 942 (Mo. banc 1969). (Appeal taken prior to January 1, 1972.)

Three tracts of land are involved: Tract I is used by Socony Mobil for its tanks for storage of oil and gas products for consumer supply; Tract II is a 600-feet frontage strip of land on the west bank of the Mississippi River from which Mobil extends into the river and maintains a terminal and pumping facility for unloading river barges; Tract III is a narrow strip of land connecting Tracts I and II through which Mobil maintains an underground pipeline to pump its product from the unloading facility to the storage facility.

Count I for ejectment involves only Tract II, the riverfront facility. Plaintiff claimed it by title and superior right to possession, and the claim emanates from Mary H. G. Houck, common owner of all three tracts. Mrs. Houck died testate in 1944 and her will devised Tract I, the storage facility, to her daughter, Rebecca Frissell, in fee tail. Mrs. Frissell, after court approval, leased Tract I to Mobil in 1953 for 50 years. Tract III, the pipeline land, was leased by Mrs. Houck during her lifetime to Aquamsi Land Co. for 99 years and, in 1954, Aquamsi leased this tract to Mobil for 50 years. Tract II passed under the residuary clause, clause ninth, of Mrs. Houck's will: "I will and devise all the remaining real estate of which I may die possessed to my son Giboney Houck to be by him either sold or divided, share and share alike among the heirs of my said daughters Erma and Rebecca and said Giboney, as to him may seem best said heirs and descendants taking the interest of their respective ancestors." This tract was idle until 1954 when it was leased by Giboney Houck to Mobil for 50 years.

Giboney Houck died in 1960 and, as a result of the conveyance of interests by his heirs and a foreclosure sale at which plaintiff was the purchaser, plaintiff acquired a paper title to Tract II. Plaintiff's position is that Giboney Houck was a trustee holding Tract II for the benefit of others and that his interest terminated with his death, that the lease is therefore void, that it is fatally defective for lack of proper description, and that defendant wrongfully holds possession. Defendant, while maintaining that Giboney Houck received sufficient interest under his mother's will to enable him to enter into the 50-year lease, takes a basic position that it makes no difference what rights were passed by the

will because all parties who may have had an interest in the leased lands ratified or confirmed by their words and conduct the acts of Giboney Houck as a lessor and they are now estopped from denying validity of the lease and defendant's right to possession.

In addition to the foregoing matters, the evidence supports the findings of fact of the trial court, most of which (as corrected by matters in brackets) are made on this review:

"Louis Houck and Mary H. G. Houck were married on December 25, 1872. They acquired the Cape Girardeau City land in issue comprising a part of Outlots 50, 63 and 64, and on the death of Louis on February 17, 1925, Mary H. G. Houck became the sole owner. On April 7, 1906, Mr. and Mrs. Houck dedicated the Village of Girardeau which comprised part of Out Lot 63 and most of Out Lot 64. The riverfront land in controversy was excluded from the dedication. On March 1, 1913, Mr. and Mrs. Houck leased the land comprising the Village of Girardeau to the Aquamsi Land Corporation for 99 years. This lease was released three days before trial on January 27, 1970.

"Mrs. Houck died testate on November 10, 1944, at the age of 96, and her will and estate were probated in the Cape Girardeau Court of Common Pleas. She had three children, a son Giboney Houck, a daughter Rebecca Houck Frissell and a daughter Erma Houck.

"Giboney was the executor of his mother's will. He never married nor had issue or adopted children and died September 16, 1960.

"Rebecca had one child, Mary Frissell Evans, who is now living. Rebecca died August 1, 1954, and her husband died in 1919.

"Erma had three children, Sally Juden Reed, Dr. A. G. Juden and Charles Andrew Juden, Sr. Sally died June 10, 1969;

Dr. Juden died December 31, 1966; and [Charles Andrew Juden, Sr., or] C. A. Juden, Sr., commonly called Andy, is still living. Erma predeceased her mother in 1911. * * *

"By the terms of her will Mary H. G. Houck makes numberous devises of land in favor of her surviving children and grandchildren in an assortment of legal estates. The property in issue passed under the residue clause of the will * * *.

"All heirs received notice of letters and of final settlement and filed final receipts. The property in controversy is a part of Out Lot 64 which was inventoried separately.

"Two or three years after Mary H. G. Houck's death, Andy Juden sent a memo to all her heirs identifying all the real estate passing to them in fee or in other estate and stating that it should be assessed to them and that all other real estate owned by Mrs. Houck was to be assessed to Giboney Houck. The inference of this memo was that Out Lot 64, which is the general description of the larger tract from which the land in issue is a part, was to be assessed to Giboney Houck.

"After Mary H. G. Houck's death, Giboney Houck rented the land in controversy to the Army Engineers or others for loading dock purposes. The rent was always made payable to Giboney.

"Andy Juden helped look after the family interests since 1933. He was the agent for the members of the family. If there were difficulties it was up to him to try to reconcile the differences between the different members of the family and see if something could be worked out 'because often times our interests were common and generally what was good for one was good for the other.' He had looked after the family interests by precedent and it was his responsibility to prepare plats and to entertain proposals and he 'handled most of them trying to separate the wheat from the chaff . . . for the entire family

group.' Juden confirmed that 'if proposals came to me I in turn submitted them just about like a real estate agent or somebody else would.' Juden negotiated other 'leases with other people, the Penn[e]ys and Woolworths and others in which the title was somewhat similar in respect to the same title of Mr. Houck.' Juden assisted in attempting to clear the family property by litigation so it could be sold or leased. He was involved in about 15 court transactions to clear the title so that a good lease could be entered into. Some of these decisions reached the Appellate Courts where it was decided that [the Houck] entailed property could be leased on a long term basis when the estate was burdensome on the tenants and remaindermen. Juden vs. Houck, Mo.Sup., 228 S.W.2d 668; Juden vs. Houck, Mo.App., 231 S.W.2d 839.

"Juden frequently showed the family properties to prospective lessees or purchasers. He took 'numberous people out to look at that (riverfront) property in the late forties and early fifties.' Thus during the 1930's, the 1940's and early 1950's, Andy Juden managed and handled the entire Mary H. G. Houck family properties. The interests of the members were entertwined and it was desirable for Juden as the local resident and agent to be in charge. It was rare that the family property could be leased or sold without litigation to clarify the title. While some members of the family had separate property interests, a prospective buyer or lessee had to deal with the family as a whole rather than individually and Andy Juden acted as the manager and agent for the family unit.

"The land in issue was assessed after Mary H. G. Houck's death in her name through 1948. From 1949 continuously through 1961 the land was assessed in the name of Giboney Houck. In 1962 it was assessed in the name of A. G. Juden.

"In 1952 defendant was interested in providing for a terminal in Cape Girardeau to service Southeast Missouri and sent its representatives L. C. Pfaff and Ray Portilla, to meet Andy Juden relative to real estate which might be available for a terminal operation. Pfaff and Portilla met Andy in Cape Girardeau in the early part of 1953 and he showed them several properties, one of which was the riverfront property in issue. It was necessary to view prospective riverfront property as defendant had to have barge facilities. It was the plan of defendant to transport its petroleum produce by river barge to the Cape Girardeau area and have available unloading, pumping and storage facilities.

"After this contact Andy wrote defendant on August 22, 1953 and offered to lease two tracts. Tract 2 was the [pipeline land and] riverfront property involved here. In the letter Andy stated 'The strip of ground between tract (2) and river is owned by Giboney Houck and available for lease of fifty (50) years at annual rental of $200.00, taxes to be paid by tenant.' On a plat drawn on the letter the river frontage is shown as 550' in length by a depth of 150'. On the plat is typed 'This strip of ground is owned by Giboney Houck.' Aerial views of the riverfront property were attached to the plat. After considerable negotiation defendant agreed to lease three separate tracts of land, the title to which had passed by will from Mary H. G. Houck to her family. Tract I was entailed to Rebecca Houck Frissell. Tracts II and III involved real estate which passed under the 9th clause of the Mary H. G. Houck will. Tract II [III] was subject to a 99 year lease in favor of Aquamsi Land Co., which company was owned by Andy Juden and his family. * * *

"The terminal lease [Tract I] was executed by defendant as lessee and Rebecca Houck Frissell as lessor on December 2, 1953. It provided for a fifty year lease of the property by defendant who was granted the right to erect its terminal [and storage] improvements on the leased premises. The lease provided that Mrs. Frissell shall as life tenant bring suit to confirm her execution as binding on herself and all re-

maindermen. The lease is binding if approved by the court and is not valid otherwise. The lease provided that it is also contingent upon defendant being able to obtain a lease of the pipeline ground for Aquamsi Land Corporation and a lease of the riverfront property from Giboney Houck for 'dockage and unloading purposes on the Mississippi River' both for a fifty year term. If defendant was not able to obtain the riverfront lease and the pipeline lease for fifty years, the Frissell lease, at defendant's option, shall terminate.

"In order to comply with the requirements of the terminal [storage] lease and with the aid of counsel and Andy Juden, on December 5, 1953, Rebecca Houck Frissell filed a suit in the Cape Girardeau Court of Common Pleas, naming the heirs of her mother, Mary H. G. Houck, as defendants. Mrs. Frissell alleged that she and the other parties are the life tenants and remaindermen of certain property passing to her under her mother's will. She states the land has been vacant for fifteen years and is unproductive and she has a chance to rent it to defendant for 50 years. She further asks that the court confirm her execution of the lease as lessor and that it be binding on all parties to the lawsuit. Summons were served on all defendants. To each summons was attached a copy of the petition and of the Frissell lease.

"All minors and unborn heirs had guardians ad litem appointed to represent them. A Decree in favor of plaintiff, Mrs. Frissell, was entered by the court February 11, 1954. One witness, Andy Juden, testified on behalf of Mrs. Frissell to confirm the allegations of the petition. Juden testified that he had discussed the nature of the suit with all the parties except the minors. He identified the Frissell lease and it was admitted in evidence. He also testified that both the life tenant and remaindermen would benefit by the lease but that if the court would not approve it the property would bring nothing on the basis of past experience and that 'I think it is a fantastic lease, yes, sir, I do.' There was no evidence in opposition to the suit and all heirs of Mary H. G. Houck had notice that the Frissell lease was dependent upon successful leasing with Giboney Houck of the riverfront property in question.

"After the terminal or 'Frissell' lease was approved by the court the pipeline easement and the riverfront leases were negotiated and the entire project was completed May 26, 1954.

"Throughout the period of time from the showing of the riverfront property by Andy Juden to representatives of defendant in 1953 to the closing of the transaction on May 26, 1954, much negotiation occurred between the parties. While there were no negotiations with Mrs. Frissell and only one or two with Giboney Houck, considerable communication was had between Pfaff, Martin and Kling, Mobil employees, and their attorney, Edward L. Downs, in Cape Girardeau, and Andy Juden, the latter of whom played an integral part in the entire project.

"The final closing of the entire transactions occurred at Giboney Houck's office in Cape Girardeau on May 26, 1954. Those present were Downs, Pfaff, Martin and Kling on behalf of defendant and Giboney Houck, Andy Juden and a notary, Milton Leyhe. At that time the riverfront lease was signed by Giboney Houck and the pipeline lease was signed by Giboney Houck individually and as President of Aquamsi Land Company. His signature was attested by that of Charles A. Juden, Secretary.

"The authority authorizing the officers of Aquamsi to enter into the pipeline lease with defendant was a resolution of the Directors of the Company, dated April 17, 1954, and signed by Houck as President of the Board and by Charles A. Juden as Secretary.

"Two other documents were executed at the closing, the first of which was an affidavit signed by Charles A. Juden, Secretary, Aquamsi Land Company, stating that

no one was in possession of the pipeline property and that the corporation was in good standing with the Missouri Secretary of State. The second affidavit was executed by Giboney Houck. In that document he averred that the land leased in the riverfront and pipeline agreements were left to him under the ninth clause of his mother's will and that it was his belief and judgment that he had the fee title in such lands and the right to enter into the leases. All of these documents were recorded on May 26, 1954. Houck had previously signed another affidavit on April 29, 1954, stating that either he or Aquamsi Land Co. had paid the taxes on the land in issue since 1913.

"All of the aforementioned affidavits and leases were notarized by Milton Leyhe who in 1954 was the manager of Capaha Loan and Finance Company, which has its offices one half block from the Houck-Juden office where the closing took place. Andy Juden, at that time, was President of the Loan Company and Leyhe's immediate superior. At the time of closing, Andy Juden called him to notarize the closing documents and he saw all parties sign in each other's presence.

"At the time of closing a $5,000.00 check was given by defendant to Giboney Houck in the presence of Andy Juden. Houck retained the money. A $10,000.00 check for Mrs. Frissell was given to Andy Juden who took it to Mrs. Frissell at her residence and she gave a receipt for the check.

"Following the closing, defendant took possession of the land in the three leases. A terminal and five storage tanks were erected on the Frissell property, a pipeline was laid on the Aquamsi Land Company property and a docking facility was built on the riverfront property, all written [within] a few months after the closing. The cost of the project in 1954 was $299,349.00.

"Rebecca Houck Frissell died August 1, 1954, slightly over two months after the final closing. At her death Giboney Houck was the only remaining surviving child of Mary H. G. Houck. His only heirs then were Mary Evans, the one child of his sister Mary Frissell and Andy Juden, Sally Reed and Dr. A. G. Juden, the children of his deceased sister, Erma Juden.

"Giboney Houck died testate on September 16, 1960, and his estate was administered by his executor, Andy Juden, in the Cape Girardeau Court of Common Pleas. The will divided Houck's estate into three parts, one to Andy Juden, one to Rebecca Frissell, one half to Sally Reed and one half to A. G. Juden. Houck provided 'that the division of my property shall be by or with the concurrence of my said executor, Andy Juden.'

"After the death of Giboney Houck the family had a friendly distribution of all the interests that passed under his mother's will. As a result of that distribution Dr. A. G. Juden acquired Out Lots 63 and 64, of which the land in question is a part. The distribution was handled by the use of a straw party. C. A. Juden and wife, Dr. A. G. Juden and wife, Sally Reed and husband, and Mary Frissell Evans and husband deeded this and other property to Ronald S. Reed, Jr., son of Sally Reed, on April 19, 1961. He, in turn, conveyed the property in question to Dr. A. G. Juden, on April 24, 1961.

"In 1963 or 1964, Andy Juden helped arrange a loan for his brother Dr. A. G. Juden from the First National Bank of Memphis, for $65,000.00. Dr. Juden gave his note to Andy for $65,000.00 and secured it with a Deed of Trust on the land in question. The trustee was attorney Edward L. Downs. Andy pledged that note and Deed of Trust plus some securities for the Memphis bank loan which he gave to the doctor. John Craig, a local real estate dealer had appraised the property and this appraisal was used by the Memphis bank to justify its real estate loan. [According to Andy] Dr. Juden was an alcoholic and his brother Andy handled his business. He

helped him get money and the doctor spent it.

"Andy told his brother, the doctor, that if he wanted to clear up the title to the property in question he should file a lawsuit and talk to his attorney. On June 24, 1963, Dr. Juden's attorney wrote defendant complaining about its lease and on September 1, 1965, Dr. Juden filed the first suit against this defendant, alleging unlawful detainer.

"On August 8, 1966, almost a year after this suit had been filed, Dr. Juden borrowed $60,000.00 from the First National Bank of Cape Girardeau, Missouri. The loan was arranged by Andy Juden, a director and stockholder of the bank, through the bank president, Richard Swaim. Swaim never talked with Dr. Juden about the loan. Andy Juden proposed that the land in issue and certain stocks *h*e pledged as security for the loan. Of the pledged security, Dr. Juden owned stocks having a value of $12,240.00 and Andy offered his own stocks having a value of $38,275.00 as additional security.

"Andy Juden instructed the Memphis bank to send its real estate appraisal on the land in issue to the Cape Girardeau bank and the latter used it for the Deed of Trust to secure the loan to Dr. Juden plus the pledged stocks. The reason for the arrangement for the Cape Girardeau Bank loan to Dr. Juden was to enable him to obtain funds to pay his obligation to Andy, who, in turn, could pay his indebtedness to the Memphis Bank. In this way Andy would not be directly involved other than the pledge of his stocks.

"Dr. Juden died December 31, 1966, only a few months after he obtained the $60,000.00 loan from the Cape Girardeau bank. His estate was opened January 5, 1967, but the inventory and appraisal was not filed until March 4, 1968, over 14 months after Letters Testamentary were granted Mrs. Juden. The bank, on August 18, 1967, filed a claim against the estate for the $60,000.00 note. The executrix consented to the payment of the claim and it was allowed by the court. No effort was made to collect the claim out of the estate assets and at the instance of Andy Juden a decision was made by the bank to foreclose the Deed of Trust securing the note.

"The decision to foreclose on the Deed of Trust rather than to utilize the pledged stock was made to protect Andy Juden who owned the bulk of the pledged stock.

"Foreclosure occurred July 15, 1968, and the purchaser was the present plaintiff for the price of $63,193.47. Plaintiff is the First National Bank of Cape Girardeau as trustee for the heirs of C. A. Juden and wife. The trust was an irrevocable intervivos trust set up by C. A. Juden for his wife and children on January 2, 1962. Andy Juden, the settlor, made the preliminary arrangements for the bank as trustee of his trust to bid for the property at foreclosure. Gilbert Logel, the bank's trust officer who handled the management of the trust, would never have recommended the purchase of the property by the trust at foreclosure had not Andy Juden, the settlor, recommended that the trust buy the property at the sale. Logel had never seen the property until 3 weeks before trial even though he handled and managed it for the trust after he purchased it as trustee at the sale on July 15, 1968.

"The exact foreclosure price of $63,193.-47 was borrowed by the plaintiff from the Farmers and Merchants Bank, another Cape Girardeau bank, and this sum was used to pay off the First National Bank of Cape Girardeau loan. The trust officer of the First National and Andy Juden arranged for the loan at the Farmers and Merchants Bank. There were two items of security for the trust loan at the Farmers and Merchants Bank other than the financial picture of the trust itself. The first was $35,000.00 of pledged stocks owned by Andy Juden. The second was a contract between the First National Bank of Cape Girardeau and Andy Juden and

wife, whereby Juden agreed to repurchase the property to be foreclosed if the bank would buy it at foreclosure and be unable to sell it thereafter by July 15, 1969. Attached to the contract was a letter from the First National Bank extending the repurchase date to July 15, 1970.

"In the fall of 1968 plaintiff bank was substituted as the plaintiff for Doctor Juden who originally filed the action in 1965.

"The description in the lease of the riverfront land to defendant was adequate to locate the land and the improvements erected by defendant as a barge unloading terminal are located on the land described in the lease."

The court made the following conclusions of law:

"2. Irrespective of the estate in land created by the ninth clause of the Mary H. G. Houck will, all the heirs and devisees of Mary H. G. Houck that may have had an interest in the land leased by Giboney Houck to defendant were appraised of and familiar with the entire project whereby defendant proposed in 1953 and 1954 to lease three separate tracts of real estate for its terminal, pipeline and dock facility from different members of the family. All of such heirs and devisees knew that each lease was dependent on the other two and that unless defendant could lease the riverfront property from Giboney Houck for a fifty year term, the other two leases would not become effective. All knew that the property involved in each lease was passed by the terms of the Mary H. G. Houck will and that each may have had an interest in these properties and that the defendant intended to erect valuable improvements on each of the lease properties.

"3. The acquiescence of those heirs and devisees of Mary H. G. Houck that may have had an interest in the riverfront land in the lease of the land by Giboney Houck to defendant and their failure to raise any claim as owners they may have had from the date of the lease on May 26, 1954 until

suit was filed on September 1, 1965, and their apparent support of the entire project as a family unit, amounts to an approval, ratification or confirmation of such lease.

"4. Plaintiff is thereby estopped to deny or question the validity of the lease in favor of defendant.

"5. Plaintiff is not entitled to possession of the premises of the land described in the riverfront lease.

"6. Defendant is entitled to possession of the land described in the riverfront lease.

"7. Plaintiff is not entitled to eject defendant from the land described in Count I of its Third Amended Petition (the riverfront lease land) nor is defendant guilty of trespass as alleged in Count II of such petition.

"8. No basis for injunctive relief in favor of plaintiff and against defendant has been established.

"9. The defenses of estoppel, ratification, latches and violation of the Statute of Limitations were properly raised in this action in ejectment.

"10. The defense of estoppel, ratification, latches and violation of the Statute of Limitations are applicable to this plaintiff as it stands in the shoes of the ultimate predecessor in title, the heirs and devisees of Mary H. G. Houck, against whom such defenses have been established.

"11. Plaintiff and its predecessors in title are guilty of latches in failing to assert any cause of action they may have had for a period in excess of 10 years from the time defendant entered into possession of the land.

"12. Because of the foregoing findings of law it becomes unnecessary to determine the exact estate passing by the 9th clause of the Mary H. G. Houck will.

"13. The description in the lease of the riverfront land by Giboney Houck to defendant was adequate to locate the land."

This review is upon both the law and the evidence, and the judgment shall not be set aside unless clearly erroneous. Rule 73.01(d), V.A.M.R. (Appellant's Point I.)

Appellant's principal attacks on the court's judgment are contained in its Points II and III.

Under Point II, appellant asserts the court erred in relying upon various affirmative defenses asserted by defendant which were either "waived, did not lie * * * or were not supported by the record." More particularly, appellant says that the finding of ratification had been waived because it was not pleaded; that its action was one at law against which equitable defenses do not lie; that the doctrine of laches does not apply to its action; that in any event laches could not have occurred until the death of Giboney Houck in 1960, and therefore is not a tenable defense under the facts; that in no event could estoppel apply by way of the defense of the ten-year statute of limitations or under general principals of law; that neither the five-year nor the ten-year statute of limitations could be a bar to plaintiff because the action could not be brought until the death of Giboney Houck, and that none of the asserted defenses would apply to the facts in this case. Under Point III appellant asserts that upon all the evidence it was entitled to judgment "on ejectment and trespass and on the other grounds asserted by it * * * and inasmuch as the defenses asserted * * * do not apply or were not shown on the record and because under no theory could the defendant be said to have a right to possession * * * it was clear error" for the court to grant judgment to defendant and same should be "reversed granting judgment to the plaintiff."

The thrust of the trial court's findings is that, irrespective of the estate created by the ninth clause of the will of Mary H. G. Houck, all family members who may have had an interest in the land leased by Giboney Houck to Mobil were informed of and familiar with Mobil's entire project in which it proposed in 1954 to lease three separate tracts for unloading, pipeline, and storage facilities from different family members; that all knew that the entire project was dependent upon a satisfactory 50-year lease of Tract II between Giboney Houck and Mobil on the riverfront for Mobil's unloading facility, and also on obtaining satisfactory leases on Tracts I and III; and that promotion of the project by the family and acquiescence of the family in the lease by Giboney Houck and in Mobil's improvements on subject tracts amount to such approval, ratification and confirmation by the family of the Tract II lease, that the family's successor, the plaintiff, is estopped to deny the validity of Mobil's lease.

The overriding question is whether the evidence supports the estoppel as found by the trial court. If the trial court could properly so find under the evidence, it is then not necessary, as noted by the trial court, to construe clause nine of Mrs. Houck's will, nor would it be necessary to consider the application of the additional defenses of laches and limitations.

■ Respondent Socony Mobil Oil Company in 1954 erected improvements having a value of nearly $300,000 on three tracts of leased land. The tracts were leased from separate owners, all of whom were members of the same family. Mobil's project was such that not one of the leases was of value without the other two. There is no question of validity of the leases for the tracts upon which the storage and pipeline facilities were constructed; plaintiff's action centers only on the lease for riverfront tract and unloading facility. Plaintiff purchased the riverfront tract with full knowledge of defendant's lease and occupancy and the pending action. Defendant does not deny plaintiff's paper title to the riverfront tract, but ejectment does not depend upon title for relief; the criterion is the right to possession. Harris v. L. P. and H. Construction

Co., 441 S.W.2d 377, 383[12–14] (Mo.App. 1969); Rule 89.06, V.A.M.R.

There is no question that since 1954 Mobil has been occupying and in possession of the tract in dispute as the lessee in a recorded lease having a 50-year term. If such lease is valid or, rather, if plaintiff does not have the right to challenge validity of the lease due to conduct of its predecessors in title, defendant would have the right to continue in possession of the leased premises.

The doctrine of estoppel has been found applicable against parties in situations akin to the situation of plaintiff in this case. It has been applied against trust beneficiaries concerning action of their trustee which may have been improper if the beneficiaries, by their conduct, acquiesced in the trustee's act (Scullin v. Clark, 242 S.W.2d 542, 548 (Mo.1951); Russell v. Russell, 427 S.W.2d 471, 478 (Mo.1968)) against remaindermen who ratify the wrongful act of the life tenant (Gabbert v. Ireland, 337 S.W.2d 62 (Mo.1960)) and against cotenants when one cotenant enters into a lease of land held by all if the other cotenants, by their conduct, ratify the lease (State ex rel. State Highway Commission v. Demarco, 445 S.W.2d 379, 388 (Mo. App.1969); Land Clearance for Redevelopment Auth. v. Dunn, 416 S.W.2d 948, 950 (Mo.1967)). As in Scullin v. Clark, supra, 242 S.W.2d l.c. 548[6]: "Technical 'estoppel' is not here involved. * * * 'The doctrine, under the various designations of concurrence, acquiescence, confirmation, ratification and estoppel, is a part of equity jurisprudence and must be upheld.'" See also application of estoppel where defendant is permitted under claim of possession to erect valuable improvements on land in which plaintiff has an interest and acquiesces, McCullough v. Newton, 348 S.W.2d 138, 142–143 (Mo.1961); where one accepts benefits from improper real estate transactions, Lawson v. Cunningham, 275 Mo. 128, 204 S.W. 1100, 1105, 1108 (Banc 1918).

Appellant's contention that since its action in ejectment is an action at law, equitable defenses of estoppel or laches cannot be raised is without merit. Such assertion may have been true at common law, Hayes v. Schall, 229 Mo. 114, 129 S.W. 222 (1910), but it is well settled that estoppel is now properly raised in an action for ejectment, Harris v. L. P. and H. Construction Co., supra; Boone v. Oetting, 342 Mo. 269, 114 S.W.2d 981 (1938); Brooks v. Cooksey, 427 S.W.2d 498, 503 (Mo.1968); Section 509.090, RSMo 1969, V.A.M.S.

The defense of estoppel has been adequately pleaded, McCullough v. Newton, supra; it is a valid defense, irrespective of the estate created in Mrs. Houck's will, and the facts found by the trial court warrant application of the doctrine as a defense to plaintiff's claim. Under the authorities, such facts demonstrate that all the elements of an estoppel are present, Rodgers v. Seidlitz Paint and Varnish Co., 404 S.W.2d 191, 195 (Mo.1966); and also demonstrate ample support for the trial court's determination that plaintiff is estopped from denying the validity of the riverfront lease on the concurrence, acquiescence, confirmation, ratification and estoppel of the interested Houck heirs and of Andy Juden, plaintiff's settlor, Scullin v. Clark, supra.

Appellant contends Mobil is not entitled to the benefit of estoppel because Mobil should have been aware of the lack of title in Giboney Houck. The evidence shows, however, that Mobil was not purchasing title but was obtaining a lease. It relied upon the total project being put together, Giboney Houck was held out as owner of the riverfront tract, and the whole family did deal either in person or through Andy Juden, and with notice of the entire project. Whether Mobil with its legal staff should have operated differently in this situation was an issue of fact for resolution by the trial court and the resolution is not made to appear clearly erroneous.

With the case in this posture, there was and is no cause to mention further the specific defenses of laches and limitations; neither is it necessary to construe clause ninth of Mrs. Houck's will to determine the interest of Giboney Houck in the river-front tract. (Appellant's Point VI.)

Appellant contends the lease from Giboney Houck to Mobil "must fail and that in fact it was void ab initio by virtue of the completely defective description."

Robert Hahn, civil engineer and City Engineer for Cape Girardeau, made a survey of the riverfront tract as described in the lease from which he prepared a plat, Exhibit O–2. He found two iron pins, monuments alluded to in the lease description, and identified them on the plat. He was able to locate the leased premises from the description and identified certain wire fence around Mobil's dock facility as being within the lease description. Plaintiff's witness, Richard T. Kogge, also a surveyor, had difficulty locating the leased premises from the lease description but he could do so by other means. He, too, noted the fencing within the lease description. The particular problem arose by calls along a course and distance "more or less to the top of the bank" (of the river).

■ The description was not well drawn but the court properly could find from the evidence that the property in question could be located. This would satisfy the rule that: "Although the description need not be technically accurate in order to make an instrument operative as a conveyance, it must identify the property sufficiently to enable a surveyor to locate it * * *. The description must be sufficiently certain to distinguish the land intended to be conveyed from all other land." Eckhardt and Peterson, Possessory Estate, Future Interests and Conveyances in Missouri, Volume 23, V.A.M.S. pp. 72, 73. See also Hamburg Realty Co. v. Woods, 327 S.

W.2d 138, 149, 150 (Mo.1959), that a description containing phrases such as land "lying east of the Missouri River" and "lying north of the center of the old Chute" was not void for want of certainty and permitted use of the entire description plus extrinsic evidence to identify the property, saying: " '[A] court will declare a deed void for uncertainty of description only where, after resorting to oral proof or after relying upon other extrinsic or external proof or evidence, that which was intended by the instrument remains mere matter of conjecture.' " 327 S.W.2d l.c. 150.

Appellant complains also (IV) that it was error to permit a plat, Exhibit U–1, "as the same was introduced without foundation to enlarge on the description in defendant's lease, * * * and because without it, the description * * * was utterly without meaning."

■ The record is not clear with respect to the status of this exhibit. It was marked both "D–I–1–30–70" and "D–U–1–1/30/70." As D–I, it appears to have been received in evidence without objection in connection with defendant's opening statement where it was represented to be admissible by stipulation; as D–U–1, it appears to have been admitted over objection by plaintiff that it was not attached to an exhibit which was the subject of a prior stipulation. In either event, D–I or D–U–1 is a map of Mobil's proposed river terminal and pipeline drawn in red on a plat of Outlot 64, U.S.P.S. 2199, Cape Girardeau, Missouri. The same information is shown on defendant's Exhibit O–2 which was received without objection. O–2 was prepared by Mr. Hahn and it further contains the lease description and the description he drew after locating the leased tract by its description. In these circumstances, Exhibit D–U–1 was cumulative of D–O–2 and its admission was not an abuse of discretion. State ex rel. State Highway Com-

mission v. DeLisle, 425 S.W.2d 938 (Mo. 1968).

Appellant contends (V) that it was error to permit witness Mulroney to testify over objection "for the reason that said witness was unknown to the plaintiff and that his testimony given was prejudicial to the plaintiff's case."

Gerald P. Mulroney, on behalf of defendant, testified over objection that defendant's improvements on the three tracts cost $299,349. Appellant's objection was that the testimony was not relevant; that the witness was unknown to plaintiff; and that defendant failed in its continuing duty under the interrogatories to advise plaintiff of the witnesses defendant intended to call.

It is true that defendant failed to furnish the name of witness Mulroney in its continuing duty under the interrogatories to keep plaintiff advised of the witnesses it intended to call. However, by interrogatory directed to and answered by defendant, plaintiff was advised that the cost of construction was $296,000. Accordingly, it appears that plaintiff sought such information and, despite the slight difference, was advised in advance of the cost of construction secured from witness Mulroney at trial. Thus plaintiff was not surprised; the cost was relevant on the issue of estoppel (valuable improvements erected on leased premises in reliance upon the validity of the lease), and no abuse of discretion is presented.

Judgment affirmed.

WELBORN, C., not participating.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the Court.

All of the Judges concur.